# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

| | |
|---|---|
| CENT. IOWA POWER COOP., | |
| Plaintiff, | No. 06-CV-0053-LRR |
| vs. | |
| MIDWEST INDEP. TRANSMISSION SYS. OPERATOR, INC.; RESALE POWER GROUP OF IOWA; AFTON, IA; AMANA SOC'Y SERV. CO.; AMANA, IA; ANITA MUN. UTILS.; ANITA, IA; COGGON MUN. LIGHT PLANT; COGGON, IA; DYSART, IA; FARMERS ELEC. COOP.; FRYTOWN, IA; GRAND JUNCTION MUN. LIGHT PLANT; GRAND JUNCTION, IA; HOPKINTON MUN. UTIL.; HOPKINTON, IA; LAPORTE CITY UTILS.; LAPORTE CITY, IA; LONG GROVE, IA; MAQUOKETA, IA; NEW LONDON MUN. UTILS.; NEW LONDON, IA; OGDEN MUN. UTILS.; OGDEN, IA; PRESTON, IA; STANHOPE, IA; STATE CTR., IA; STORY CITY MUN. ELEC. UTILS.; STORY CITY, IA; STRAWBERRY POINT UTILS.; STRAWBERRY POINT, IA; TIPTON, IA; TRAER MUN. UTILS.; TRAER, IA; VINTON MUN. ELEC. UTIL.; VINTON, IA; and WEST LIBERTY, IA, | **ORDER** |
| Defendants. | |

_____

**TABLE OF CONTENTS**

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**

II.  PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

    A.   The Federal Energy Regulatory Commission . . . . . . . . . . . . . . . . . **4**

    B.   Iowa District Court in and for Linn County  . . . . . . . . . . . . . . . . . **4**

    C.   United States District Court for the Northern District of Iowa . . . . . . **5**

III. FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **7**

    A.   CIPCO'S Relationship with Iowa Electric Light & Power Company
        and Alliant Energy Corporation . . . . . . . . . . . . . . . . . . . . . . . . **7**

        1.   Operating and Transmission Agreement  . . . . . . . . . . . . . . **7**

        2.   Tariffs  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **9**

        3.   Interstate Power & Light Company and Alliant Energy
            Corporation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **10**

    B.   Midwest ISO, Ameren and RPGI  . . . . . . . . . . . . . . . . . . . . . . . **10**

    C.   Alliant as a Member of Midwest ISO . . . . . . . . . . . . . . . . . . . . . **12**

    D.   Ameren's Relationship with RPGI . . . . . . . . . . . . . . . . . . . . . . . **14**

    E.   RPGI's Relationship with Midwest ISO  . . . . . . . . . . . . . . . . . . . **16**

    F.   Correspondence involving CIPCO, RPGI, Midwest ISO and IPL  . . **17**

    G.   FERC Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

IV.  PRINCIPLES OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **33**

V.   THE MERITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **36**

    A.   The Parties' Arguments  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **36**

        1.   Initial Argument Offered by Midwest ISO  . . . . . . . . . . . . **36**

        2.   CIPCO's Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . **38**

        3.   RPGI's Resistance  . . . . . . . . . . . . . . . . . . . . . . . . . . . **40**

        4.   Midwest ISO's Resistance  . . . . . . . . . . . . . . . . . . . . . . **42**

        **5.**       *CIPCO's Reply* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **43**

    **B.**       *Complete Preemption Does Not Apply* . . . . . . . . . . . . . . . . . . . . **44**

    **C.**       *State Action Discloses Contested and Substantial Federal Issue* . . . . **45**

**VI.**    **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **48**

## I. INTRODUCTION

The matter before the court is the Motion to Remand (docket no. 9), filed by Central Iowa Power Cooperative ("CIPCO"). Midwest Independent Transmission System Operator, Inc. ("Midwest ISO") and Resale Power Group of Iowa ("RPGI") resisted the Motion to Remand. The remaining defendants ("Participants of RPGI"),[1] by and through RPGI, also resisted the Motion to Remand. CIPCO replied to the resistances filed by Midwest ISO and RPGI. Although Midwest ISO requested a hearing, the court finds that a hearing is not warranted in light of the record. The matter, therefore, is fully submitted and ready for decision.

---

[1] For purposes of the Motion to Remand, the Participants of RPGI consist of RPGI's members, that is, utilities that are associated and on whose behalf RPGI purchases electric energy, capacity and transmission service, and municipalities that are related to those members or utilities. The thirty-five Participants of RPGI include: Afton, Iowa; Amana, Iowa; Amana Society Service Co.; Anita, Iowa; Anita Municipal Utilities; Coggon, Iowa; Coggon Municipal Light Plant; Dysart, Iowa; Frytown, Iowa; Farmers Electric Cooperative; Grand Junction, Iowa; Grand Junction Municipal Light Plant; Hopkinton, Iowa; Hopkinton Municipal Utility; LaPorte City, Iowa; LaPorte City Utilities; Long Grove, Iowa; Maquoketa, Iowa; New London, Iowa; New London Municipal Utilities; Ogden, Iowa; Ogden Municipal Utilities; Preston, Iowa; Stanhope, Iowa; State Center, Iowa; Story City, Iowa; Story City Municipal Electric Utilities; Strawberry Point, Iowa; Strawberry Point Utilities; Tipton, Iowa; Traer, Iowa; Traer Municipal Utilities; Vinton, Iowa; Vinton Municipal Electric Utility; and West Liberty, Iowa.

3

## II. PROCEDURAL BACKGROUND

### A. The Federal Energy Regulatory Commission

On or about August 26, 2004, CIPCO filed a Complaint against Midwest ISO with the Federal Energy Regulatory Commission ("FERC"). CIPCO sought relief under the Federal Power Act ("FPA"), 16 U.S.C. § 791a, *et seq*. On February 7, 2005, FERC concluded that CIPCO, as a Rural Utility Service ("RUS")-financed electric cooperative and not a regulated public utility under the FPA, did not fall within its jurisdiction. On November 1, 2005, FERC denied CIPCO's request for rehearing and clarified its prior conclusion that CIPCO did not fall within its jurisdiction.

### B. Iowa District Court in and for Linn County

On March 6, 2006, CIPCO filed a Petition against Midwest ISO, RPGI and the Participants of RPGI in the Iowa District Court in and for Linn County. In the Petition, CIPCO asserted four counts: (1) Quantum Meruit or Implied Contract In Fact—CIPCO contends that Midwest ISO delivers energy and power over its electrical transmission system to RPGI and the Participants of RPGI and that Midwest ISO does not compensate CIPCO for the use of its electrical transmission system; (2) Unjust Enrichment or Implied Contract In Law—CIPCO claims that Midwest ISO receives a benefit by delivering power over CIPCO's electrical transmission system, that RPGI and the Participants of RPGI receive a benefit by accepting power delivered over CIPCO's electrical transmission system and that the receipt of such benefits without compensating CIPCO is inequitable and detrimental to CIPCO; (3) Trespass—CIPCO maintains that Midwest ISO, RPGI and the Participants of RPGI are using CIPCO's electrical transmission system without its permission and without compensating it and that such unlawful use substantially interferes with CIPCO's exclusive possession, use and enjoyment of the electrical transmission system; and (4) Conversion—CIPCO alleges that Midwest ISO, RPGI and the Participants of RPGI intentionally used and continue to use CIPCO's electrical transmission system

4

without compensating CIPCO and that they have wrongfully exerted dominion over CIPCO's property. As relief, CIPCO seeks:

> (1) Payment from [RPGI and the Participants of RPGI] that have received energy and power carried over CIPCO's electrical transmission system in an amount that will compensate CIPCO for the use of its [electrical transmission system] based upon the applicable service charges established in [the CIPCO Open Access Transmission Tariff]; or in the alternative, . . .

> (2) Payment from [Midwest ISO] for delivering power and energy over CIPCO's electrical transmission system since [Midwest ISO] never sought permission to use CIPCO's electrical transmission system to deliver power and energy to [the Participants of RPGI] and has never compensated CIPCO for this use. CIPCO seeks compensation based upon the applicable service charges established in [the CIPCO Open Access Transmission Tariff]; and

> (3) An order from the court ordering [Midwest ISO, RPGI and the Participants of RPGI] to pay CIPCO for the use of its electrical transmission system [and] for any future use of CIPCO's [electrical transmission] system; and

> (4) Interest and costs of this action plus any other relief deemed equitable and appropriate by the court.

On April 13, 2006, Midwest ISO, relying on 28 U.S.C. § 1441 and 28 U.S.C. § 1446, filed a Notice of Removal in the Iowa District Court in and for Linn County and this court.

### C. United States District Court for the Northern District of Iowa

In the Notice of Removal, Midwest ISO contends that the court has original jurisdiction of this matter under 28 U.S.C. § 1331. To support its contention, Midwest ISO states that the FPA governs CIPCO's allegations because the FPA vests exclusive jurisdiction in the federal courts over (1) claims concerning duties, responsibilities and

5

violations occurring under tariffs issued by independent system operators and approved by FERC; and (2) FERC-jurisdictional contracts. RPGI and the Participants of RPGI joined Midwest ISO's Notice of Removal.

On May 12, 2006, CIPCO filed the instant Motion to Remand. In the Motion to Remand, CIPCO alleges that remand is proper because the court lacks subject matter jurisdiction. To support its position, CIPCO states that CIPCO never set forth a federal question in the Petition and Midwest ISO fails to establish that the issues raised in the Petition arise under federal law.

On May 26, 2006, RPGI filed a Resistance ("First Resistance") to the Motion to Remand. In the First Resistance, RPGI argues that remand is inappropriate for two reasons: (1) CIPCO's claims arise under federal law and are completely preempted; and (2) CIPCO's claims require the resolution of significant federal questions. On May 30, 2006, Midwest ISO filed a Resistance ("Second Resistance") to the Motion to Remand. In the Second Resistance, Midwest ISO argues that remand is not warranted because the claims asserted by CIPCO in the Petition are governed by the FPA.

On June 2, 2006, Midwest ISO filed an Answer to the Petition.

On June 9, 2006, CIPCO submitted a Reply. In the Reply, CIPCO contends that the resolution of its state-law claims does not raise a disputed or substantial federal issue.

On June 12, 2006, RPGI filed an Answer to the Petition.

### III. FACTUAL BACKGROUND[2]

#### A. CIPCO'S Relationship with Iowa Electric Light & Power Company and Alliant Energy Corporation[3]

CIPCO is a RUS-financed electric cooperative or borrows funds from the RUS, and, therefore, it is not a regulated public utility under the FPA. CIPCO is engaged in the generation, transmission and distribution of electric power and energy; it provides, on a not-for-profit basis, the wholesale power requirements of its twelve rural electric cooperative members and one municipal electric cooperative association, which in turn provide retail electrical service to over 260,000 Iowans. CIPCO is not a member of Midwest ISO. Iowa Electric Light & Power Company ("Iowa Electric") is also engaged in the generation, transmission and distribution of electric power and energy. Iowa Electric is a FERC-jurisdictional utility that is subject to section 205 of the FPA, 16 U.S.C. § 824d, and section 206 of the FPA, 16 U.S.C. § 824e.

#### 1. Operating & Transmission Agreement

In 1946, CIPCO and Iowa Electric entered into an Operating and Transmission Agreement. In 1991, CIPCO and Iowa Electric revised and restated the Operating and Transmission Agreement ("O&T Agreement"). The purpose of the O&T Agreement is to facilitate the smooth integration of transmission facilities and to clarify the rights and

---

[2] FERC maintains an eLibrary that allows the public to access documents issued and received by FERC. FERC's eLibrary may be accessed at the following address: http://www.ferc.gov/docs-filing/elibrary.asp. *See Stutzka v. McCarville*, 420 F.3d 757, 760 n.2 (8th Cir. 2005) (addressing court's ability to take judicial notice of public records).

[3] The facts in this subsection are primarily compiled from the following sources: CIPCO's Petition; *Cent. Iowa Power Coop.*, FERC Docket No. EL04-129; *IES Indus. Inc.*, FERC Docket No. ER94-247; *Cent. Iowa Power Coop. v. Midwest Indep. Transmission Sys. Operator, Inc.*, 110 FERC ¶ 61,093 (2005); http://www.cipco.net/about.asp; and http://www.alliantenergy.com.

7

responsibilities of the respective transmission owners. Under the O&T Agreement, CIPCO and Iowa Electric coordinate planning and construction of new transmission facilities and lines to enhance efficiency and reduce duplication of facilities in an area defined as the integrated transmission system ("ITS"). CIPCO and Iowa Electric do not jointly own transmission facilities that are included in the ITS. Rather, CIPCO and Iowa Electric have title to and own discrete transmission facilities and substations.[4] The O&T Agreement confers to Iowa Electric operational control over the ITS.[5] Further, under the O&T Agreement, Iowa Electric and CIPCO have the right to use the ITS, which includes the other party's facilities, to serve its customers or members.[6] Finally, use of the ITS for the benefit of other systems or electric suppliers is governed by the O&T Agreement. Specifically, where either Iowa Electric or CIPCO enter into an agreement with a third

---

[4] Section 5.03 of the O&T Agreement, in relevant part, provides: "CIPCO and [Iowa Electric] shall each retain their present ownership of transmission lines, substations and associated equipment."

[5] Section 5.06 of the O&T Agreement, in relevant part, provides: "[Iowa Electric] shall provide all management, supervision, operating supplies, services and labor for the operation of CIPCO's transmission facilities included in the [ITS]."

[6] Section 5.14 of the O&T Agreement provides:
> CIPCO and [Iowa Electric] each shall have the use of the [ITS], including the right to tap the transmission facilities of the other [p]arty for the purpose of serving its customers or members in the [ITS]. No wheeling charge shall be made by either [p]arty for the use of such facilities necessary to serve the customers of the [p]arties. Either [p]arty shall give the other sufficient advance notice in writing prior to tapping such facilities to insure proper system coordination.

8

party to provide transmission for the third party, the agreement must be approved by Iowa Electric and CIPCO.[7]

## 2. *Tariffs*

As a FERC-jurisdictional public utility, Iowa Electric submitted the O&T Agreement as a rate schedule in its Open Access Transmission Tariff ("Iowa Electric OATT").[8] Iowa Electric also included a basis of its charges with the O&T Agreement. In part, it states:

> The [O&T] Agreement provides various methods for the reimbursement and pricing of various services entailed in the integration of the parties' generation and transmission systems. Some of these arrangements arguably do not involve jurisdictional services (i.e., sales for resales or transmission services) but may have some impact on the ultimate pricing of jurisdictional services and therefore are included.

Iowa Electric also clarified that:

> In the event that either party utilizes the [ITS] in providing transmission services to a third party, all revenues received from the Transmission Agreement are shared by both parties

---

[7] Section 5.15 of the O&T Agreement provides:
> In the event that either CIPCO or [Iowa Electric] enter into an agreement with a non-party to this [O&T] Agreement to wheel power for such non-party, or to serve customers of said non-party, thereby utilizing the [ITS], the agreement with respect to such transaction shall be approved both by CIPCO and [Iowa Electric]. Any monies paid to CIPCO or to [Iowa Electric] for such services shall be shared by both in the same proportion as the basis for investment in transmission facilities described in Section 5.17 hereof.

[8] FERC uses the term "rate schedule" to describe the rate filings that must be submitted under section 205(c) of the FPA, 16 U.S.C. § 824d(c). A rate schedule "[must] be in writing and may take the physical form of a contractual document, purchase or sale agreement, lease of facilities, tariff or other writing." 18 C.F.R. § 35.2(b).

9

in the same proportion as the basis for investment in the transmission facilities.

With respect to the O&T Agreement, FERC accepted it for filing and designated it as FERC Rate Schedule No. 89 in August of 1994.

CIPCO adopted a non-federal or pro forma Open Access Transmission Tariff ("CIPCO OATT") and provides transmission service to third parties based on rate schedules that are included in the CIPCO OATT.

### 3. Interstate Power & Light Company and Alliant Energy Corporation

Interstate Power & Light Company ("IPL") is a subsidiary of Alliant Energy Corporation ("Alliant"). IPL succeeded Iowa Electric under the O&T Agreement. As a successor, IPL is a regulated utility, that is, a FERC-jurisdictional utility that is subject to section 205 of the FPA, 16 U.S.C. § 824d, and section 206 of the FPA, 16 U.S.C. § 824e. Further, the O&T Agreement is included in IPL's Open Access Transmission Tariff ("IPL OATT").

### B. Midwest ISO, Ameren and RPGI[9]

Midwest ISO is a not-for-profit FERC-jurisdictional public utility. Midwest ISO provides transmission service pursuant to the rates, terms and conditions of its Open Access Transmission and Energy Markets Tariff or Open Access Transmission Tariff ("Midwest ISO OATT").[10] The Midwest ISO OATT was filed pursuant to section 205 of

---

[9] The facts in this subsection are primarily compiled from the following sources: CIPCO's Petition; *Cent. Iowa Power Coop.*, FERC Docket No. EL04-129; *Midwest Indep. Transmission Sys. Operator, Inc.*, FERC Docket No. ER98-1438; *Midwest Indep. Transmission Sys. Operator, Inc.*, 84 FERC ¶ 61,231 (1998); *Midwest Indep. Transmission Sys. Operator, Inc.*, 108 FERC ¶ 61,008 n.1 (2004); http://www.midwestiso.org/home; and http://www.ameren.com.

[10] Alliant's zonal rates are included under the Midwest ISO OATT. Alliant or IPL receives revenue or compensation pursuant to the Midwest ISO OATT.

10

the FPA, 16 U.S.C. § 824d. FERC granted Midwest ISO regional transmission organization ("RTO") status in December of 2001 and Midwest ISO began offering regional transmission service (point to point transmission service and network integration transmission service) in February of 2002. As an RTO, Midwest ISO provides transmission service to its members.[11]

Ameren Corporation ("Ameren") is a electric and gas utility. Ameren Energy Marketing Company ("AEMC") sells power and energy. AEMC is a subsidiary of Ameren. Ameren Services Company ("Ameren Services") is also a subsidiary of Ameren. Ameren Services, as agent for certain of Ameren's subsidiaries, is a member of Midwest ISO.

RPGI is an association of 29 Iowa electric utilities that are mostly owned by municipalities. RPGI purchases energy and capacity on behalf of the Participants of RPGI. RPGI also enters into transmission service agreements on behalf of the Participants of RPGI. To serve certain Participants of RPGI, AEMC or RPGI's wholesale power supplier

---

[11] Midwest ISO "link[s] up the transmission lines of the member transmission-owning utilities [. . .] into a single interconnected grid stretching across the northern border of the U.S. from Michigan to eastern Montana, and reaching as far south as Kansas City, Missouri and Louisville, Kentucky." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1365 (D.C. Cir. 2004). Pursuant to an Agreement of Transmission Facilities Owners to Organize Midwest ISO or the Transmission Owners Agreement, transmission owners

> retain ownership of and physically operate and maintain their transmission facilities, subject to [Midwest ISO's] instructions[, and Midwest ISO exercises] functional control of the transmission system, with responsibility for calculating available transmission capability; receiving, approving, and scheduling transmission service requests; and providing or arranging for ancillary services under [the Midwest ISO OATT].

*Id*.

11

takes transmission service over the ITS, that is, transmission facilities that are owned by CIPCO and IPL. Such transmission facilities are located in the control area of IPL or Alliant's subsidiary.[12]

### C. Alliant as a Member of Midwest ISO[13]

On November 18, 1999, Alliant joined Midwest ISO. Alliant is a transmission facilities owning member of, and a participant in, Midwest ISO. On December 3, 1999, Alliant, relying on section 203 of the FPA, 16 U.S.C. § 824b, filed an application with FERC to transfer functional operational control over certain of its jurisdictional transmission facilities to Midwest ISO. CIPCO intervened in that proceeding because Alliant's application listed certain CIPCO owned facilities that would be transferred to Midwest ISO. On March 31, 2000, FERC authorized Alliant to transfer functional operational control over certain of Alliant's jurisdictional transmission facilities to Midwest ISO. FERC only approved the transfer of the jurisdictional transmission facilities owned by Alliant. Midwest ISO now administers Alliant's transmission facilities and service across these facilities, that is, the transmission facilities that are included in the Alliant West Control Area.[14]

---

[12] A control area is a defined portion of the electric power grid that is responsible for overseeing the supply and demand for electricity within its area and for managing related functions to assure reliability.

[13] The facts in this subsection are primarily compiled from the following sources: CIPCO's Petition; RPGI Exhibits; *Cent. Iowa Power Coop.*, FERC Docket No. EL04-129; *Alliant Energy Corporate Servs., Inc.*, FERC Docket No. ER02-330; *Alliant Energy Corporate Servs., Inc.*, FERC Docket No. EC00-29; *Cent. Iowa Power Coop. v. Midwest Indep. Transmission Sys. Operator, Inc.*, 110 FERC ¶ 61,093 (2005); *Midwest Indep. Transmission Sys. Operator, Inc.*, 99 FERC ¶ 61,117 (2002); *Alliant Energy Corporate Servs., Inc.*, 90 FERC ¶ 61,344 (2000).

[14] Alliant is the control area operator for the Alliant West Control Area. The ITS
(continued...)

12

On January 28, 2002, Midwest ISO filed a notice of succession. Such notice advised FERC that Alliant assigned to Midwest ISO certain of its ongoing transmission service agreements and network transmission service and operating agreements to ensure that those customers with ongoing transactions would continue to be served under the Midwest ISO OATT. Specifically, Alliant assigned to Midwest ISO a Network Operating Agreement that Alliant entered into with MidAmerican Energy Company ("MidAmerican") in 1998 ("1998 Network Operating Agreement"). On April 26, 2002, FERC accepted Midwest ISO's notice of succession. Prior to Alliant's assignment, FERC designated the 1998 Network Operating Agreement as Operating Agreement No. 191 in Alliant's Open Access Transmission Tariff ("Alliant OATT"). The terms of the 1998 Network Operating Agreement required Alliant to provide network integration transmission service until December 31, 2003 to MidAmerican, which entered into the Network Operating Agreement so that it could deliver to the Participants of RPGI the energy that RPGI purchased. As a successor, Midwest ISO adopted, ratified and made as its own all the applicable rate schedules that Alliant filed with FERC under the Alliant OATT. Accordingly, from January 1, 1999 to February 1, 2002, Alliant utilized the ITS to effectuate the delivery of energy to the Participants of RPGI and provided transmission service under the Alliant OATT, and, as a successor to Alliant's agreement with MidAmerican, Midwest ISO utilized the ITS to effectuate the delivery of energy to the Participants of RPGI and provided transmission service under the Midwest ISO OATT from February 1, 2002 to December 31, 2003.

---

[14](...continued)
is located within the Alliant West Control Area.

### D. Ameren's Relationship with RPGI[15]

On January 1, 2004, RPGI began purchasing power from AEMC for the Participants of RPGI. Under a power supply agreement ("AEMC/RPGI Supply Agreement"),[16] AEMC agreed to sell electric energy to RPGI and to arrange for the transmission of that energy to the Participants of RPGI. The AEMC/RPGI Supply Agreement took effect on January 1, 2004 or the date after RPGI's power supply agreement with MidAmerican expired.[17] Under Section II and Section III.A of the AEMC/RPGI Supply Agreement, AEMC agreed to acquire adequate amounts of firm transmission and related services for purposes of delivering the energy from its generation facilities to certain delivery points within the ITS. In addition, under Section III.B of the AEMC/RPGI Supply Agreement, AEMC agreed to act as agent for RPGI for the sole purpose of procuring and administering the transmission service arrangements required for delivering the energy from the delivery points to the Participants of RPGI's load.

AEMC entered into two FERC-jurisdictional agreements to satisfy its transmission obligations under the AEMC/RPGI Supply Agreement. With respect to its obligations under Section III.A of the AEMC/RPGI Supply Agreement, AEMC entered into a service agreement ("AEMC Service Agreement") with Ameren Services. The AEMC Service Agreement provided for firm point-to-point transmission service from January 1, 2004 to January 1, 2005. Such transmission service involved delivery of 166 megawatts of

---

[15] The facts in this subsection are primarily compiled from the following sources: CIPCO's Petition; RPGI Exhibits; *Midwest Indep. Transmission Sys. Operator, Inc.*, FERC Docket No. ER04-738-000; *Midwest Indep. Transmission Sys. Operator, Inc.*, FERC Doc. No. ER02-1227; *Midwest Indep. Transmission Operator, Inc.*, 108 FERC ¶ 61,008 (2004); *Alliance Cos., et al.*, 100 FERC ¶ 61,137 (2002).

[16] AEMC and RPGI originally entered into a power supply agreement on April 8, 2003 and subsequently amended it.

[17] The 1998 Network Operating Agreement also expired on December 31, 2003.

14

capacity and energy from Ameren to Alliant, and the AEMC Service Agreement designated the Alliant/RPGI load as the sink.[18] After it received approval to join Midwest ISO, Ameren Services assigned its ongoing transmission agreements to Midwest ISO, and, on April 15, 2004, Midwest ISO filed a notice of succession. Such notice advised FERC that certain ongoing transmission service agreements and network service integration transmission service and operating agreements between Ameren Services and various transmission customers had been assigned to Midwest ISO. Midwest ISO explained:

> At 12:01 a.m. on May 1, 2004, Ameren [Services] is expected to commence operations under [Midwest ISO] and, in turn, [Midwest ISO] is expected to begin providing transmission service for Ameren [Services]. As a result, transmission-related services previously available by Ameren [Services] in accordance with [Ameren Services' Open Access Transmission Tariff ("Ameren Services OATT")] will then be available pursuant to the Midwest ISO OATT and certain grandfathered agreements.

To ensure that the customers under those agreements would continue to be served, Midwest ISO requested authorization to take assignment of each agreement and to provide transmission service under the Midwest ISO OATT.

Midwest ISO's notice of succession included an attachment which listed the ongoing transmission service agreements that Ameren Services assigned to Midwest ISO. The AEMC Service Agreement, which had been designated Service Agreement No. 597 in the Ameren Services OATT, is listed as an assigned ongoing transmission service agreement and it is redesignated as FERC Rate Schedule No. 584 in the Midwest ISO OATT. On April 19, 2004, FERC acknowledged receipt of Midwest ISO's notice of succession. On May 21, 2004, CIPCO protested Midwest ISO's filing of Service Agreement No. 597 to

---

[18] With respect to transmission service, power travels from the "source" to the "sink".

Case 1:06-cv-00053-LRR   Document 34   Filed 03/30/07   Page 15 of 49

the extent that such agreement permits transmission customers to use CIPCO's facilities without compensating CIPCO. On June 7, 2004, Midwest ISO filed an answer. On June 22, 2004, CIPCO filed an answer. On June 24, 2004, RPGI sought to address the contentions advanced by CIPCO. On July 6, 2004, FERC accepted Midwest ISO's notice of succession. FERC also rejected CIPCO's contentions.

AEMC satisfied its obligations under Section III.B of the AEMC/RPGI Supply Agreement on February 12, 2002 or the date that AEMC and Midwest ISO entered into a service agreement for network integration transmission service ("Service Agreement No. 358"). Service Agreement No. 358 incorporated the provisions of the Midwest ISO OATT. The updated, December 11, 2003 transaction specification sheet that is related to Service Agreement No. 358 stated that AEMC, acting on behalf of RPGI, sought to procure from Midwest ISO network integration transmission service, that is, the delivery of 166 megawatts of capacity and energy, from January 1, 2004 to January 1, 2005. Additionally, the transaction specification sheet designates Ameren as the point of receipt and Ameren as the delivering party, and it describes Alliant as the point of delivery and RPGI as the receiving party. Thus, just as it had from February 1, 2002 to December 31, 2003, Midwest ISO utilized the ITS to effectuate the delivery of capacity and energy to the Participants of RPGI, and Midwest ISO provided network integration transmission service under the Midwest ISO OATT from January 1, 2004 to January 1, 2005.

## E. RPGI's Relationship with Midwest ISO[19]

On May 1, 2004, Midwest ISO and RPGI entered into a service agreement for network integration transmission service ("Midwest ISO Service Agreement"). Pursuant to the Midwest ISO Service Agreement, Midwest ISO delivers the wholesale power purchased by RPGI from Ameren to the Participants of RPGI. Such power is delivered

_____

[19] The facts in this subsection are primarily compiled from the following source: RPGI Exhibits.

Case 1:06-cv-00053-LRR    Document 34    Filed 03/30/07    Page 16 of 49

by Midwest ISO to the Participants of RPGI over the ITS. Under the Midwest ISO Service Agreement, Midwest ISO agreed to provide network integration transmission service upon RPGI's request. Such transmission service fell under the Midwest ISO OATT and nullified or mooted AEMC's obligation to obtain transmission service on behalf of RPGI. As AEMC acknowledged in a letter dated November 22, 2004:

> Once the Midwest ISO OATT became effective for the Ameren Transmission System, the point-to-point transmission service previously secured by [AEMC] from the Ameren Transmission System to deliver Capacity and Energy to RPGI was no longer required. Therefore, as of May 1, 2004, the Network Integration Transmission Service agreement that RPGI has with [Midwest ISO] is the only transmission service required for capacity and energy deliveries to be made under [the AEMC/RPGI Supply Agreement].

Thus, all of the energy that RPGI purchased from either MidAmerican or AEMC has been delivered to the Participants of RPGI on the ITS pursuant to rate schedules and tariffs that have been filed in accordance with section 205(c) of the FPA, 16 U.S.C. § 824d(c).

### F. Correspondence involving CIPCO, RPGI, Midwest ISO and IPL[20]

In a letter dated October 6, 2003, CIPCO informed Ameren that power could not be delivered to the Participants of RPGI, that is, a number of Iowa cities who were going to purchase power from Ameren after January 1, 2004 as part of a new RPGI supply contract, without using CIPCO's facilities. CIPCO also informed Ameren that, in order to provide electrical service to the Participants of RPGI or complete the transmission service path to the Participants of RPGI, a variety of CIPCO transmission lines and substation facilities would have to be utilized, and CIPCO requested that Ameren work with CIPCO so that CIPCO's transmission system could be utilized.

_____

[20] The facts in this subsection are primarily compiled from the following sources: CIPCO's Petition and *Cent. Iowa Power Coop.*, FERC Docket No. EL04-129.

17

On November 3, 2003, RPGI responded to CIPCO's October 6, 2003 letter. RPGI wrote:

> Your letter suggests that Ameren must purchase transmission service from [CIPCO], as well as [Alliant] (on behalf of [IPL]) to begin delivering power on January 1, 2004 to the [Participants of RPGI].
>
> RPGI respectfully disagrees with CIPCO's assertion. Each of the communities cited in your October 6, 2003 letter interconnects directly with the transmission facilities of IPL. CIPCO is still a party to the [O&T Agreement] which created [the ITS] between what is now the Alliant System and CIPCO. [The O&T Agreement] has been amended several times to account for the mergers of [Iowa Electric] into what is now [Alliant], but the [ITS] arrangement has stayed in place. Sections 5.15 and 5.16 of the [O&T Agreement] both contemplate that transmission service over the [ITS] will be provided to third parties. Section 5.15 provides that either what is now IPL or CIPCO, but not both, will collect a rate for transmission service over the [ITS] from the third parties, and that "[a]ny monies paid to CIPCO *or* to [Iowa Electric] for such services shall be shared by both in the same proportion as the basis for investment in transmission facilities described in Section 5.17 hereof." (emphasis supplied). During the last five years, [MidAmerican], the current energy supplier to RPGI, paid only IPL for network transmission service for deliveries to the [Participants of RPGI]. This confirms both the practice of assessing only one transmission charge for the single transmission service over the [ITS] and comports with both the letter of the [O&T Agreement] as well as the practice by other utilities in the Upper Midwest that have created combined systems by contract.
>
> There is nothing different in substance about the proposed transmission service for Ameren than was the case under the existing arrangement for MidAmerican. RPGI understands that [Midwest ISO] rather than IPL, will be the contracting party with Ameren by virtue of the fact that IPL turned

> operational control of its transmission system, and,
> presumably, the [ITS] to [Midwest ISO]. [Midwest ISO] is
> bound to honor existing contracts, including the [O&T
> Agreement].

On November 10, 2003, Midwest ISO also responded to CIPCO. Midwest ISO disagreed with the assertions CIPCO made in its October 6, 2003 letter and offered several clarifications. Midwest ISO wrote:

> The [Participants of RPGI] are currently served using network
> transmission service obtained on their behalf by
> [MidAmerican], the transmission customer, acting as agent for
> RPGI. The original network service agreement where
> [Alliant] was acting as the transmission provider under [the
> Alliant OATT] became effective on January 1, 1999, and this
> agreement was later assigned to [Midwest ISO] as the
> transmission provider when [Midwest ISO] became the tariff
> administrator under its regional tariff in February [of] 2001.
> CIPCO was not a party to this original service agreement and
> need not be a party to any new network service agreement to
> serve the [Participants of RPGI]. Ameren, acting as agent for
> RPGI, will be the transmission customer and [Midwest ISO]
> will continue in its capacity as the transmission provider. In
> fact, even though the [Participants of RPGI] are located in the
> [Alliant West Control Area], Alliant will not be a party to the
> new network service agreement as [it is] no longer the
> transmission provider.
>
> Secondly, [. . . under] the terms of [the O&T Agreement,
> Iowa Electric] and CIPCO agreed to construct, own and
> maintain transmission facilities that are a part of an [ITS]. The
> [O&T Agreement] further allows the parties use of the [ITS]
> without any wheeling charges on a reciprocal basis. Any
> revenues generated from third party use of the [ITS] are to be
> distributed in proportion to the [parties'] investment basis [. .
> . .] Midwest ISO is not a party to [the O&T Agreement], nor
> do we administer any of the terms of [the O&T Agreement].
> [The O&T Agreement] is between [Alliant] and CIPCO. Any

19

questions related to compensation or revenue sharing should be directed to Alliant.

Finally, [. . .] Midwest ISO only has the authority to collect revenues for transmission service provided under the [Midwest ISO OATT] and [. . . Midwest ISO] is obligated to distribute revenues to the transmission owners who have transferred functional control of their transmission facilities owned and operated at 100 kV or above to [Midwest ISO]. CIPCO is not currently participating in [Midwest ISO] as a transmission owner. Therefore, [. . .] Midwest ISO cannot administer the terms of the CIPCO [OATT], or distribute any revenues to a party not participating as a transmission owner.

On December 2, 2003, CIPCO responded to RPGI's November 3, 2003 letter. CIPCO insisted that compensation by RPGI for use of CIPCO's system is required and is appropriate, in part, because:

No "joint tariff" for IPL and CIPCO exists at this point in time, nor has it previously. [Midwest ISO] is administering the provision of transmission service on the IPL system. The tariff rate for the IPL system includes only IPL Annual Transmission Revenue Requirements (ATRR). No CIPCO ATRR costs are included in the Midwest ISO/IPL rate. It is necessary for the CIPCO [OATT] rate to be paid in order for CIPCO to be compensated for use of CIPCO['s] facilities.

Mention was made in your letter of the [O&T Agreement] Section 5.15 language which pertains to the sharing of revenues by the parties. It is faulty logic to assert that the sharing of money paid to one party "OR" the other means only one transmission charge will exist.

On December 8, 2003, Midwest ISO sought to clarify its letter dated November 10, 2003. Specifically, Midwest ISO stated that it did not want to imply that CIPCO is not entitled to compensation from Alliant under the terms of the O&T Agreement and it

20

recognizes the O&T Agreement as a Grandfathered Agreement under Attachment P to the Midwest ISO OATT. Midwest ISO also stated:

> [I]ssues regarding the appropriateness for entitlement to compensation under the [O&T Agreement] is specified in the [O&T Agreement]. Those matters can be worked out between the parties to the [O&T Agreement], CIPCO and Alliant, in the context of Ameren's recent request for network transmission service. [Midwest ISO] is not a party to the [O&T Agreement] and makes no assertions one way or the other regarding the appropriateness of compensation to CIPCO [. . .]

On December 22, 2003, RPGI responded to CIPCO's December 2, 2003 letter. RPGI reiterated that Ameren is not obligated to pay both CIPCO and IPL for the use of their integrated facilities in order to serve the participants of RPGI, that is, Ameren, as RPGI's agent, will purchase transmission service over the ITS only from Midwest ISO and it will not be purchasing that same transmission service from CIPCO. RPGI also advised that, if CIPCO revenue requirements are not fully reflected in the Midwest ISO rate for service over the ITS, CIPCO should seek a change in the applicable rate charged to third parties for use of the ITS. On January 27, 2004, CIPCO responded to RPGI's December 22, 2003 letter. CIPCO maintained that the unauthorized and uncompensated use of CIPCO's facilities by RPGI violates applicable law. CIPCO also maintained:

> [T]he arrangement between [IPL] and CIPCO is a pre-Order 888 arrangement, before Alliant was required to have on file with [FERC] an [OATT] with rates that recover its investment costs. Neither [the Alliant OATT] nor Alliant's zonal rate that operates under the Midwest ISO [OATT] includes the costs of CIPCO's facilities. Consequently, the charge for recovering the costs associated with use of CIPCO's facilities are directly assignable to RPGI, and are not recovered elsewhere (in [the IPL OATT], [the Alliant OATT], or the Midwest ISO OATT).

21

On February 5, 2004, RPGI responded to a January invoice that CIPCO sent and CIPCO's January 27, 2004 letter. RPGI, in part, wrote:

> While [AEMC] technically is the transmission customer with respect to the subject transaction, RPGI is ultimately responsible for the cost. Nevertheless, neither [AEMC] nor RPGI take transmission service from CIPCO; hence, neither will remit payment for the invoice.
>
> [Midwest ISO] provides transmission service over the integrated transmission facilities of CIPCO and IPL and that, by [the O&T Agreement] between CIPCO and IPL, as well as in fact, the integrated facilities over which [Midwest ISO] provides transmission service includes the CIPCO transmission facilities that are integrated with the IPL system. [The O&T Agreement] gives [IPL] the authority to provide transmission service over the combined facilities of IPL and CIPCO. It also provides for IPL to divide any revenues received for such transmission service with CIPCO, as appropriate. We assume that CIPCO does not contest that [IPL] transferred functional control over the combined transmission facilities to [Midwest ISO] under the applicable [Midwest ISO] agreements. Moreover, at no time do we understand CIPCO ever to have suggested that [AEMC] or RPGI required CIPCO's permission before [Midwest ISO] commenced providing transmission service to [AEMC] as agent for RPGI.
>
> [AEMC's] payments to [Midwest ISO] (and RPGI's payments to [AEMC]) for the transmission service provided by [Midwest ISO] thus constitutes full satisfaction for the service provided by [Midwest ISO], including any service over CIPCO's facilities.

On August 17, 2004, IPL and CIPCO wrote a letter to Midwest ISO. IPL and CIPCO sought to clarify several issues. They stated:

> [T]he O&T Agreement clearly requires compensation for use of the IPL/CIPCO system by third parties. This O&T Agreement is a Grandfathered Agreement that is listed on

22

Attachment P of the Midwest ISO [OATT]. Section 5.15 of the O&T Agreement requires an agreement between both parties—IPL and CIPCO—before third party use can be allowed. No agreement was ever reached between CIPCO and IPL because [Midwest ISO] never contacted IPL about the use of CIPCO's facilities to serve the [Participants of RPGI]. Therefore, [Midwest ISO] has no right, under the O&T Agreement, to use CIPCO's facilities to provide transmission service to the [Participants of RPGI]. Since CIPCO is not a transmission owning member of [Midwest ISO], the O&T Agreement is the only valid agreement that would permit third party (RPGI) use of CIPCO's facilities (unless a party contracted directly with CIPCO under [the CIPCO OATT)].

RPGI claims that the O&T Agreement requires that IPL share with CIPCO IPL's zonal rate revenue under the Midwest ISO OATT. This is a view not shared by either of the signatories to the O&T Agreement. The sharing of revenue under [S]ection 5.15 of the O&T Agreement only occurs after an agreement has been reached between IPL and CIPCO for such third party use. RPGI completely ignores this important requirement of 5.15 of the O&T Agreement.

[Midwest ISO] has been previously advised, but to be absolutely clear, [Midwest ISO] is on notice, that when transmission service utilizes the IPL system, it should notify IPL so that, as control area operator, it can determine whether CIPCO's facilities will be utilized for such deliveries. If CIPCO's facilities are used, pursuant to the O&T Agreement, CIPCO and IPL agree that the rate shall be the sum of IPL's zonal rate under the Midwest ISO OATT, plus the point to point rate under the CIPCO [OATT]. Any attempt by [Midwest ISO] to not honor this arrangement shall constitute a breach of Alliant's contractual relationship with [Midwest ISO] and a breach of the O&T Agreement. [Midwest ISO] is further on notice that it has no right to access IPL's facilities in ways that result in a breach of the O&T Agreement. [. . .]

23

Alliant's zonal rate under the Midwest ISO OATT does not include the costs of CIPCO's facilities, but only recovers the costs of IPL's facilities. No CIPCO revenue requirements are included in the computation of the IPL zonal rate under the Midwest ISO OATT. Under FERC's ratemaking standards and the O&T Agreement, [Midwest ISO] must charge an additional amount to recover the costs of CIPCO's transmission facilities. CIPCO has previously supplied [Midwest ISO] with its [OATT] rate for this service, such that [Midwest ISO] must charge Ameren, who is the Midwest ISO transmission customer serving the [Participants of RPGI], the zonal rate plus the CIPCO rate, for the CIPCO transmission capacity used in the delivery to the [Participants of RPGI].

### G. FERC Complaint[21]

In August of 2004, CIPCO filed the Complaint. Relying on section 206 of the FPA, 16 U.S.C. § 824e, CIPCO alleged that Midwest ISO utilized CIPCO's facilities when it delivered electrical power to the Participants of RPGI and Midwest ISO did so without CIPCO's permission and without compensating CIPCO. As relief, CIPCO asked FERC to order Midwest ISO to collect a facilities charge based upon rates established in the CIPCO OATT. Alternatively, CIPCO asked FERC to state that nothing in its order permits Midwest ISO to use CIPCO's facilities without compensation.

Notice of CIPCO's Complaint was published in the Federal Register. On September 2, 2004, IPL filed a motion to intervene. In such motion, IPL argued in support of CIPCO's assertion that Midwest ISO must receive authorization to use facilities that are included in the ITS and owned by CIPCO. On September 15, 2004, RPGI filed a motion to intervene and answer. In its motion to intervene and answer, RPGI, among other

---

[21] The facts in this subsection are compiled from the following sources: CIPCO's Petition; *Cent. Iowa Power Coop. v. Midwest Indep. Transmission Sys. Operator, Inc.*, 113 FERC ¶ 61,116 (2005); *Cent. Iowa Power Coop. v. Midwest Indep. Transmission Sys. Operator, Inc.*, 110 FERC ¶ 61,093 (2005); and *Cent. Iowa Power Coop.*, FERC Docket No. EL04-129.

24

things, asserted that: (1) CIPCO's requested facilities charge would result in pancaked rates; (2) CIPCO did not raise this issue when IPL was the third party transmission provider between 1999 and 2002, and IPL never made additional payments to CIPCO for the service provided from 1999 to 2002; (3) the current transmission rate reflects the use of the facilities used to serve RPGI; (4) Midwest ISO has operational control over the ITS, and all scheduling on the ITS must be done through Midwest ISO's OASIS; and (5) CIPCO should address its cost recovery issues with IPL and have IPL, the Midwest ISO member, address any resulting rate adjustment issues with Midwest ISO. On the same date, Midwest ISO filed an answer. In its answer, Midwest ISO, among other things, contended that it may not arrange for payment to CIPCO because (1) CIPCO is not a member of Midwest ISO and Midwest ISO has no authority to make payments to non-members and (2) compensation under the O&T Agreement is a matter between CIPCO and IPL. Midwest ISO also denied that its use, if any, of CIPCO's facilities was unauthorized and disputed that it violated the Midwest ISO OATT. To support its position, Midwest ISO argued: (1) the transmission customer, not Midwest ISO, must arrange third party transmission; (2) although the transaction specification sheet for network integration service provides for direct assignment facilities charges, CIPCO's claimed compensation does not fall within that category; and (3) FERC is without authority to approve CIPCO's charges because CIPCO is a non-jurisdictional RUS-financed cooperative. Further, Midwest ISO claimed that the additional charge sought by CIPCO would constitute rate pancaking.

On September 30, 2004, CIPCO filed an answer to the answers. Among other things, CIPCO argued that, if Midwest ISO was concerned about a lack of privity of contract with CIPCO, Midwest ISO could pay IPL, which, in turn could pay CIPCO. Additionally, CIPCO disputed that, under the O&T Agreement, use of the ITS is free. Rather, in consideration for CIPCO's and IPL's shared obligations with regard to the ITS,

CIPCO and IPL do not charge each other when the ITS is used to serve their native load customers.

On the same date, IPL filed an answer. IPL asserted that transmission to the Participants of RPGI would be physically impossible without the use of CIPCO's facilities because there would be no electrical path from Ameren to the Participants of RPGI without using CIPCO's facilities. IPL also asserted that the long-term investment obligations that CIPCO and IPL have assumed under the O&T Agreement is the underlying consideration for each of them to have access to the ITS at no additional charge. Further, IPL argued that, under the O&T Agreement, a third party must compensate IPL and CIPCO when it uses the ITS. In support of its position, IPL stated:

> RPGI correctly states that it did not pay a separate charge to CIPCO when it received bundled transmission and power supply service from IPL[,] however[,] that does not mean that CIPCO was not being compensated. Since RPGI was a bundled customer of IPL, it was part of IPL's native load, and transmission over CIPCO's facilities was compensated through mutual consideration (long term investment obligation) under the O&T Agreement. When RPGI ceased to receive bundled service from IPL, it ceased to be part of IPL's native load and became a third party subject to Section 5.15 of the O&T Agreement.

> The O&T Agreement clearly requires compensation for the use of the [ITS] by third parties. The O&T Agreement is a Grandfathered Agreement that is listed on Attachment P of the Midwest ISO [OATT]. Section 5.15 thereof requires an agreement between both parties—IPL and CIPCO—before third party use may be allowed. [. . .]

> Further, Section 5.15 then provides that revenues from such third party transactions shall be shared between IPL and CIPCO, but this [S]ection was originally meant to apply after both IPL and CIPCO agreed upon a rate that would sufficiently recover their respective revenue requirements. The ability to

26

administer the [O&T Agreement] in this fashion (agreement on a rate) disappeared with Order 888.

Order No. 888 required public utilities like IPL to file OATTs with [FERC.] Prior to the issuance of that Order, when third parties sought to use the CIPCO and IPL transmission facilities, and where such use would impact both their facilities, CIPCO and IPL would reach an agreement on the use of their facilities and a rate which recovered both of their respective revenue requirements. After Order 888, IPL developed its own FERC jurisdictional OATT rate for the recovery of costs related to the use of its own facilities, [and] this FERC approved rate did not include recovery for CIPCO's cost of facilities nor provide service over CIPCO's facilities.

[. . .]

The rate that is charged today by Midwest ISO for service within the IPL rate zone under [the IPL] OATT was determined to recover the revenue requirements of IPL's transmission facilities and does not include compensation for the use of CIPCO owned facilities. In this new environment, when third parties seek transmission service over a path which must use both IPL and CIPCO facilities that are covered by the O&T Agreement, the applicable rate is the sum of IPL's zonal rate under the Midwest ISO OATT plus [the CIPCO] OATT rate.

[Midwest ISO], as the party which grants transmission service over the IPL system, must also be made to assume IPL's obligation to coordinate that service with CIPCO under [S]ection 5.15 of the [G]randfathered O&T Agreement.

In addition, IPL maintained that it is not required to include the costs of CIPCO's transmission facilities in its transmission revenue requirements and separate charges would not result in unduly discriminatory rates.

27

On October 14, 2004, Midwest ISO filed a motion to reject CIPCO's answer and IPL's answer, and, on October 20, 2004, RPGI filed a motion to strike CIPCO's answer and IPL's answer. In its motion to reject, Midwest ISO stated:

> In accordance with [FERC's] authorization, [Midwest ISO] merely provided a continuation of existing transmission service to a customer of [IPL], without changing the nature of this service in any material way. To the extent that CIPCO consented to that prior service, either because its facilities were not actually involved or because that service was in the joint economic interest of [IPL] and CIPCO, it should not be heard to complain now that [Midwest ISO] has assumed service obligations previously performed by [IPL]. The only thing that has changed is that [IPL] is no longer the transmission service provider to RPGI. . . . CIPCO cannot now cry foul simply because its partner under the O&T Agreement has been displaced as the merchant to the [Participants of RPGI], which are no longer [native load customers] of [IPL].

Further, Midwest ISO argued: (1) CIPCO never physically cut off its facilities from Midwest ISO, and, therefore, must be deemed to have consented to the use of its facilities; and (2) Midwest ISO cannot be required to pay the CIPCO OATT charge because it is not an eligible customer or an electric utility, as that term is defined in the FPA. Finally, Midwest ISO stated:

> It is also clear that the merits of CIPCO's uncompensated use claim cannot be properly determined until [FERC] reviews the O&T Agreement and the compensation CIPCO receives thereunder. It may very well be the case that upon such review, FERC would find that CIPCO is sufficiently compensated for any third party use of its facilities or that it should pursue its remedies in a different forum. In this proceeding, however, both CIPCO and IPL, the parties to that contractual arrangement, have steadfastly refused to propose any revisions to the O&T Agreement and have generally sought to exclude it from any meaningful FERC review.

28

[Midwest ISO] is not a party to the O&T Agreement, has never assumed any of IPL's obligations thereunder and therefore should not be required to police its terms.

Similarly, in its motion to strike, RPGI stated:

RPGI's opposition to CIPCO's [C]omplaint is based on the fact that RPGI already pays a fee for the use of CIPCO's facilities, and that CIPCO is effectively attempting to impose on RPGI an additional fee for the use of those facilities without following the procedures to which CIPCO is contractually bound, and without any regulatory review of the justness and reasonableness of that additional fee.

RPGI takes transmission service over CIPCO facilities that are integrated with facilities owned by [IPL], and CIPCO long ago turned over operational control of its portion of the [ITS] to [IPL] under [the O&T Agreement]. Although [IPL] subsequently turned over operational control of the [ITS] to the [Midwest ISO], the O&T Agreement is still in effect as a [G]randfathered [A]greement under Attachment P of the [Midwest ISO OATT]. CIPCO is required under the terms of the O&T Agreement to work through IPL both to obtain compensation for third party use of the [ITS], and to effect an increase in its compensation for such third party use. Rather than adhere to these contractual obligations, however, CIPCO has sought to require [Midwest ISO], an entity with which CIPCO otherwise has no contractual relationship, to collect CIPCO's additional transmission fee directly from RPGI.

CIPCO also has failed to establish that the rate currently paid by RPGI for use of the [ITS] is insufficient to satisfy CIPCO's revenue requirements. Under the O&T Agreement, [IPL] and CIPCO each have use of the other's facilities at no additional charge. Thus, the method used by [IPL] to determine its revenue requirements—which excludes from the calculation any of CIPCO's loads served by [IPL] facilities, or the cost of any CIPCO facilities used to serve [IPL loads]—produces a rate that is approximately the rate that would result if the CIPCO loads and facilities were included in the calculation.

29

> Irrespective of whether [IPL] actually shares the revenues that it receives from RPGI with CIPCO (a problem that is not RPGI's responsibility to solve), the rate that RPGI actually pays to [IPL] for use of the [ITS] is likely to be sufficient to satisfy the revenue requirements of both [IPL] and CIPCO, and CIPCO therefore has not met its burden to establish that the rate paid by RPGI is unjust and unreasonable.

On October 27, 2004, CIPCO filed an answer to Midwest ISO's motion to reject and RPGI's motion to strike.

On February 7, 2005, FERC concluded that the FPA did not provide jurisdiction over the rate included in the CIPCO OATT or the transmission service in question. Although it determined that it could not order Midwest ISO to pay CIPCO's unregulated rate, FERC stated:

> If the parties were to agree on (or a court with jurisdiction were to determine) a charge to be paid by Midwest ISO or IPL and then reflected in a jurisdictional rate, then the jurisdictional entity, whether it be IPL or Midwest ISO, could file the proposed charge with [FERC]. [FERC] has previously held that, if [CIPCO] believes that its arrangements with IPL do not properly account for the use of [the ITS] and for sharing revenues from [third party] uses, [CIPCO] may file a complaint under section 206 of the FPA to modify [its] arrangements, i.e., to modify the O&T Agreement.

In addition, FERC, when discussing its jurisdiction, stated that FERC emphasized in *Alliant Energy Corporate Services, Inc.*, 90 FERC ¶ 61,344 (2000), that it was authorizing the transfer of only the jurisdictional facilities that Alliant owned. FERC also stated:

> [The] section 203 order authorized the transfer of all relevant service agreements from IPL to Midwest ISO, including the [1998 Network Operating Agreement or] IPL-MidAmerican network integration service agreement, under which Midwest ISO transmitted power from MidAmerican to RPGI through December of 2003. However, the complaint here does not cite any side agreement, related to the [1998 Network Operating

30

Agreement], that provided for an additional facilities charge payment to [CIPCO] by either IPL or MidAmerican.

Further, FERC concluded that Ameren, not Midwest ISO, is the appropriate party to arrange third party transmission agreements under the Midwest ISO OATT because Ameren is the transmission customer. Finally, FERC found persuasive Midwest ISO's argument that the Midwest ISO OATT direct assignment facilities charge does not apply to CIPCO's facilities because CIPCO is not a transmission owner, independent transmission company or independent transmission company participant and CIPCO did not construct its facilities for the sole purpose of serving RPGI.

On March 9, 2005, CIPCO filed a request for rehearing and clarification of the order issued on February 7, 2005. CIPCO, among other things, argued that it is irrelevant whether FERC has jurisdiction over CIPCO, its facilities or its rate because the issue is whether FERC has jurisdiction to prevent Midwest ISO from using CIPCO's non-public transmission facilities without compensation; FERC's lack of jurisdiction over CIPCO does not prevent FERC from directing Midwest ISO to pay CIPCO under CIPCO's rate because the O&T Agreement is a jurisdictional contract on file with FERC, CIPCO's rate was developed pursuant to the O&T Agreement and FERC has jurisdiction over Midwest ISO. CIPCO also reiterated that, under the Midwest ISO OATT, Midwest ISO could enter into an agency agreement with IPL for access to CIPCO's facilities, and the terms of such agreement would require Midwest ISO to pay IPL for the use of IPL's facilities. According to CIPCO, IPL, which has contractual privity with CIPCO through the O&T Agreement, would then pay CIPCO. Further, CIPCO proffered alternative bases for FERC to review CIPCO's rates.

On November 1, 2005, FERC issued an order which denied CIPCO's request for rehearing and granted in part and denied in part clarification. Specifically, FERC rejected CIPCO's argument that Midwest ISO is the jurisdictional provider of the alleged

31

transmission service at issue; the service at issue is transmission service over CIPCO's non-regulated facilities. FERC reiterated that CIPCO is not a regulated public utility within FERC's jurisdiction, and, therefore, FERC cannot regulate CIPCO's rates under section 205 of the FPA, 16 U.S.C. § 824d, and section 206 of the FPA, 16 U.S.C. § 824e. Additionally, FERC stated:

> [CIPCO] attaches unwarranted reliance on the fact that the O&T Agreement is on file with [FERC]. [CIPCO] was not the entity to file the O&T Agreement with [FERC]. The O&T Agreement is jurisdictional with respect to the service provided thereunder by IPL, the jurisdictional public utility that filed it.

With respect to other issues raised by CIPCO, FERC stated:

> [CIPCO] also argues that [FERC] has previously invited it to file a complaint if Midwest ISO did not file a service agreement for its transmission service on behalf of Ameren to RPGI. [CIPCO] alleges that Midwest ISO has not filed a Network Operating Agreement for its transmission service to RPGI on behalf of Ameren. It contends that such omission has denied it and other interested parties the opportunity to file comments and protests in a section 205 proceeding.
>
> In Docket No. ER04-738-000, in the context of discussing [CIPCO's] concern with regard to the alleged lack of a filing by Midwest ISO of a service agreement for transmission service to RPGI on behalf of Ameren, we stated to [CIPCO] that it could seek compensation for the use of its facilities when an applicable service agreement was filed or, in the absence of a filing, it could file a complaint. It was not our intent to suggest that [CIPCO] could seek a remedy beyond our statutory authority to provide, as [CIPCO] has sought in this case. Rather, as the February 7 Order noted, [FERC] has previously held that, if [CIPCO] believes that its arrangements with IPL do not properly account for the use of the [ITS] and for sharing of revenues from [third party] uses, it may file a complaint to modify the O&T Agreement.

32

FERC clarified that its orders in the matter could not be interpreted to authorize any party to use CIPCO's facilities without compensation or permission. FERC also clarified that a jurisdictional entity could make a section 205, 16 U.S.C. § 824d, filing with FERC to reflect CIPCO's charge as a cost component of its jurisdictional rate. Finally, FERC stated that CIPCO could not waive the statutory restriction on FERC's jurisdiction and volunteer to be subject to FERC's jurisdiction under section 205 of the FPA, 16 U.S.C. § 824d, and section 206 of the FPA, 16 U.S.C. § 824e.

## IV. PRINCIPLES OF REVIEW

Title 28, United States Code, section 1441 governs which actions may be removed. The removal statute is strictly construed against removal jurisdiction, *Bradley v. Md. Cas. Co.*, 382 F.2d 415, 419 (8th Cir. 1967) (citations omitted), and the party seeking removal and opposing remand has the burden of establishing subject matter jurisdiction, *Green v. Ameritrade, Inc.*, 279 F.3d 590, 598 (8th Cir. 2002) (citing *In re Bus. Men's Assurance Co.*, 992 F.2d 181, 183 (8th Cir. 1993)). If at any time a district court determines that it lacks subject matter jurisdiction, the district court must remand the action. *See* 28 U.S.C. § 1447.

A defendant may remove a suit that is filed in state court to federal court if the federal court would have had original jurisdiction over the suit. *See* 28 U.S.C. § 1441(a); *see also Merrell Dow Pharms., Inc. v. Thompson*, 478 U.S. 804, 808 (1986) (stating that removal is warranted if the case originally could have been brought in federal court).

> One category of cases over which the district courts have original jurisdiction are "federal question" cases; that is, those cases "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. It is long settled law that a cause of action arises under federal law only when the plaintiff's well-pleaded complaint raises issues of federal law. *Gully v. First Nat'l Bank*, 299 U.S. 109 (1936); [*Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149 (1908)]. The "well-pleaded complaint rule" is the basic principle marking

33

> the boundaries of the federal question jurisdiction of the federal district courts. [*Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 9-12 (1983)].

*Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63 (1987); *see also Rivet v. Regions Bank*, 522 U.S. 470, 474-75 (1998) (indicating that removing party invoked district court's original federal question jurisdiction under 28 U.S.C. § 1441(b) and stating that, when addressing whether a federal question exists, the "well-pleaded complaint rule" applies); *Crews v. Gen. Am. Life Ins. Co.*, 274 F.3d 502, 504 (8th Cir. 2001) ("A cause of action arises under federal law only when the plaintiff's well-pleaded complaint raises issues of federal law[.]").

"Under the 'well-pleaded complaint rule,' a case in which federal jurisdiction is based on a federal question ordinarily is not removable unless the 'federal question is presented on the face of the plaintiff's properly pleaded complaint.'" *Chaganti & Assocs., P.C. v. Nowotny*, 470 F.3d 1215, 1220 (8th Cir. 2006) (quoting *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987)). "A defense is not part of a plaintiff's properly pleaded statement of his or her claim." *Rivet*, 522 U.S. at 475 (citing *Metro. Life Ins. Co.*, 481 U.S. at 63; *Gully*, 299 U.S. at 112); *see also Caterpillar*, 482 U.S. at 399 (explaining that a federal defense does not provide a basis for removal). To permit removal on the basis of a federal defense would deprive the plaintiff of the right to be the master of his or her cause of action. *Caterpillar*, 482 U.S. at 399. Thus, "[a] federal question is raised in 'those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.'" *Peters v. Union Pac. R.R. Co.*, 80 F.3d 257, 260 (8th Cir. 1996) (quoting *Franchise Tax*, 463 U.S. at 27-28); *accord Lundeen v. Can. Pac. Ry. Co.*, 447 F.3d 606, 611 (8th Cir. 2006); *see also Gully*, 299 U.S. at 112 ("To bring a case within the [federal question removal] statute, a right [. . .] created by the [. . .] laws of the United States must be an element, and an essential

34

one, of the [. . .] plaintiff's cause of action. The right [. . .] must be such that it will be supported if the [. . .] laws of the United States are given one construction or effect, and defeated if they receive another." (Citations omitted.)).

Nonetheless, a plaintiff cannot "frustrate a defendant's right of removal by carefully pleading the case without reference to any federal law." 14B Wright, Miller & Cooper, *Federal Practice & Procedure* § 3722 at 436 (3d ed. 1998); *accord Chaganti & Assocs., P.C., v. Nowotny*, 470 F.3d 1215, 1220 (8th Cir. 2006). When determining whether subject matter jurisdiction exists, a court is not required to look only to a plaintiff's artful pleading and characterizations of the evidence. *Phipps v. FDIC*, 417 F.3d 1006, 1011 (8th Cir. 2005) (citing *Nahas & Co., Inc. v. First Nat'l Bank*, 930 F.2d 608, 611-12 (8th Cir. 1991)); *see also Peters*, 80 F.3d at 260 ("A plaintiff's characterization of a claim as based solely on state law is not dispositive of whether federal question jurisdiction exists.").

> [A]n "independent corollary" to the well-pleaded complaint rule is the further principle that "a plaintiff may not defeat removal by omitting to plead necessary federal questions." [*Franchise Tax*, 463 U.S. at 22]. If a court concludes that a plaintiff has "artfully pleaded" claims in this fashion, it may uphold removal even though no federal question appears on the face of the plaintiff's complaint. The artful pleading doctrine allows removal where federal law completely preempts a plaintiff's state-law claim. *See Metro. Life Ins. Co.*, 481 U.S. at 65-66 (upholding removal based on [complete preemption]); [*Avco Corp. v. Machinists*, 390 U.S. 557, 560 (1968) (same)]. Although federal preemption is ordinarily a defense, "once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state-law claim is considered, from its inception, a federal claim, and therefore arises under federal law." *Caterpillar*, 482 U.S. at 393.

*Rivet*, 522 U.S. at 475-76; *see also Nahas & Co.*, 930 F.2d at 611-12 ("[A] plaintiff cannot thwart the removal of a case by inadvertently, mistakenly or fraudulently concealing the federal question that would necessarily have appeared if the complaint had been well

pleaded. This is a narrow exception, limited to federal statutes that so completely pre-empt a particular area, that any civil complaint raising this select group of claims is necessarily federal." (Quotations omitted.)). *But see* 14B Wright, Miller & Cooper, *Federal Practice & Procedure* § 3722 at 444-48 (3d ed. 1998) (indicating that the Supreme Court in *Smith v. Kansas City Title & Trust*, 255 U.S. 180 (1921), and *Merrell Dow Pharms. Inc.*, 478 U.S. at 804, articulated the category of necessary federal question removal jurisdiction, a category of artful pleading that is conceptually distinct from complete preemption).

## V.  THE MERITS

### A.  The Parties' Arguments

#### 1.    Initial Argument Offered by Midwest ISO

In the Notice of Removal, Midwest ISO asserts that CIPCO's claims are predicated on a subject matter that falls within a federal court's exclusive jurisdiction and cites *California ex. rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 835-36, 839-43 (9th Cir. 2004) (discussing removal jurisdiction), *T&E Pastorino Nursery v. Duke Energy Trading & Marketing, LLC*, 268 F. Supp. 2d 1240, 1245-47 (S.D. Cal. 2003) (same), and *Indeck Maine Energy, LLC, v. ISO New England Inc.*, 167 F. Supp. 2d 675, 687-90 (D. Del. 2001) (same), to support its assertion. Midwest ISO also asserts that the allegations contained in the Petition implicate section 201 of the FPA, 16 U.S.C. § 824,[22] section 205

---

[22] Section 201(a) of the FPA, 16 U.S.C. § 824(a), provides for federal regulation of "the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce." Section 201(b) of the FPA, 16 U.S.C. § 824(b), indicates that the FPA applies to "the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce."

36

of the FPA, 16 U.S.C. § 824d,[23] section 206 of the FPA, 16 U.S.C. § 824e,[24] and section 317 of the FPA, 16 U.S.C. § 825p.[25]

---

[23] Two subsections are pertinent here. Section 205(a) of the FPA, 16 U.S.C. § 824d(a), provides:

> All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of [FERC], and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

And, section 205(c) of the FPA, 16 U.S.C. § 824d(c), requires public utilities to

> file with [FERC] schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of [FERC], and the classifications, practices and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

[24] Section 206(a) of the FPA, 16 U.S.C. § 824e(a), addresses FERC's ability to fix rates and charges and to determine the cost of production or transmission. It, in relevant part, provides:

> Whenever [FERC], after a hearing held upon its own motion or upon complaint, [finds] that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of [FERC], or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, [FERC must] determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.

[25] Section 317 of the FPA, 16 U.S.C. § 825p, in relevant part, provides:

> The District Courts of the United States [. . .] shall have

(continued…)

## 2.      CIPCO's Argument

In response, CIPCO contends that remand is proper because CIPCO did not assert a federal question in the Petition and Midwest ISO fails to establish that the issues raised in the Petition present a federal question.  Regarding its first reason, CIPCO alleges that the four claims contained in the Petition do not explicitly or implicitly arise under the FPA, and the Petition does not allege that the actions of Midwest ISO, RPGI or the Participants of RPGI violate the FPA.  CIPCO contends that the cases relied on by Midwest ISO are distinguishable on the basis that the district court in each case was asked to decide the parties' rights and obligations under a federal tariff.  Further, relying on *In re California Retail Natural Gas & Electricity Antitrust Litigation*, 170 F.  Supp.  2d 1052, 1060 (D.  Nev.  2001), CIPCO states that the four claims included in the Petition do not turn on the interpretation of, enforcement of or compliance with a federal tariff, and, therefore, remand is appropriate.  Specifically, CIPCO states:

> [R]elief in state court [is sought] precisely because [CIPCO] sought federal relief under the FPA first alleging that Midwest ISO was not applying its tariff correctly [. . .].  When rebuffed by [FERC] on the basis that it had no jurisdiction under sections 205 and 206 of the FPA, CIPCO filed the present action in state court seeking relief based upon state common law theories not based upon the theories alleged in its [Complaint] primarily based upon [FERC's] ruling.

Thus, CIPCO maintains:

---

[25](…continued)
> exclusive jurisdiction of violations of [16 U.S.C. § 791a, *et seq.*] or the rules, regulations, and orders thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of, [16 U.S.C. § 791a, *et seq.*] or any rule, regulation, or order thereunder.

38

The [state-law] claims asserted by CIPCO in [the Petition] merely seek to have the state court determine whether [Midwest ISO, RPGI, and the Participants of RPGI] have an obligation to pay CIPCO for the use of its property. In none of [the four claims] will a state court be asked to interpret a federal statute, the U.S. Constitution or a federal tariff. The state court will be required to determine whether CIPCO is entitled to compensation and what amount will compensate CIPCO for the use of its electrical transmission system. CIPCO has not asked the state court to construe [the Midwest ISO OATT] or any other federally filed tariff. CIPCO does assert that [the CIPCO OATT] is the proper basis for measuring its damages; however, the state court will be determining whether [the CIPCO OATT] is an appropriate measure of damages, not a federal tariff. By operation of the well-pleaded complaint rule, Midwest ISO fails to establish that CIPCO's claims arise under a federal law.

Concerning its second reason, CIPCO claims that Midwest ISO fails to articulate how section 201 of the FPA, 16 U.S.C. § 824, section 205 of the FPA, 16 U.S.C. § 824d, and section 206 of the FPA, 16 U.S.C. § 824e, create a federal cause of action for CIPCO or how CIPCO's right to relief depends on resolution of these sections. CIPCO explains that its claims do not seek to interfere with the federal regulation of the transmission of electric energy in interstate commerce, as provided by section 201 of the FPA, 16 U.S.C. § 824, and FERC already determined that neither section 205 of the FPA, 16 U.S.C. § 824d, nor section 206 of the FPA, 16 U.S.C. § 824e, provided FERC with jurisdiction to review the claims that CIPCO advanced in its Complaint. Apart from relying on FERC's determination that it did not have jurisdiction over the rate included in the CIPCO OATT, CIPCO stated that, under section 205 of the FPA, 16 U.S.C. § 824d, and section 206 of the FPA, 16 U.S.C. § 824e, jurisdiction is determined by who the service provider is, and, consequently, the four claims could not arise under the FPA because CIPCO is the service provider in question. According to CIPCO, Midwest ISO, by arguing that the FPA

39

governs the outcome of this dispute, is essentially attempting to collaterally attack FERC's previous conclusion that it did not have jurisdiction over the claims that CIPCO asserted.

Similarly, CIPCO asserts that Midwest ISO fails to articulate how the claims in the Petition require a state court to rule upon violations arising under the FPA or any federal tariff; CIPCO believes that section 317 of the FPA, 16 U.S.C. § 825p, is irrelevant given FERC's conclusion that the FPA did not control the claims asserted in the Complaint. Moreover, CIPCO states that the existence of an exclusive jurisdiction provision, that is, section 317 of the FPA, 16 U.S.C. § 825p, does not mean that the entire field is preempted; rather, CIPCO asserts that it means that federal preemption is a defense. Finally, CIPCO claims that several courts have determined that the FPA does not completely preempt state law.

### 3.  *RPGI's Resistance*

In the First Resistance, RPGI argues that: (1) CIPCO artfully pleaded in a manner that deprives RPGI of its right to a federal forum; (2) CIPCO's claims for relief arise under federal law and are completely preempted; (3) CIPCO's claims for relief necessarily depend on the resolution of a substantial federal question; and (4) relief is available to CIPCO under federal law but CIPCO refuses to pursue such relief.

With regard to its first argument, RPGI relies on the artful pleading doctrine and contends that the relief CIPCO seeks is barred by the scheme of exclusive remedies provided in Part II and Part III of the FPA, 16 U.S.C. §§ 824-828c, and necessarily depends on the resolution of significant federal questions.

Concerning its second argument, RPGI contends that CIPCO is attempting to conceal the federal nature of its claims by artfully pleading quantum meruit or implied contract in fact, unjust enrichment or implied contract in law, trespass and conversion. RPGI states that FERC-jurisdictional transmission providers, not CIPCO, have provided transmission service to RPGI on the ITS and such service has been provided at rates

40

established under FERC approved OATTs, both before and after Alliant joined Midwest ISO. RPGI also states that CIPCO has never objected to Midwest ISO's operation of the ITS, which necessarily includes CIPCO's facilities under the O&T Agreement, and CIPCO is now seeking additional payment from either Midwest ISO or RPGI for the same services that Midwest ISO provided under the Midwest ISO OATT. Based on those statements, RPGI claims that CIPCO is impermissibly demanding that a state court modify the filed rates that are part of the Midwest ISO OATT. As authority, RPGI cites: *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 580 (1981) (discussing and relying on exclusive jurisdiction principles); *Public Utility District No. 1 v. Dynegy Power Marketing, Inc.*, 384 F.3d 756, 760-61 (9th Cir. 2004) (same); *Public Utility Dist. No. 1 v. IDACORP Inc.*, 379 F.3d 641, 648-49 (9th Cir. 2004) (same); and *Lockyer*, 375 F.3d at 849-50 (same).

With respect to its third argument, RPGI contends:

> Removal jurisdiction is proper under circumstances where "the right to relief depends upon the construction or application of [federal law]." *Grable & Sons Metal* [*Prods.*]*, Inc. v. Darue Eng'g & Mfg.*, [545 U.S. 308, 313] (2005) (quoting [*Smith*, 255 U.S. at 199]). The dispositive issue is whether "a state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Id.* at [314].

According to RPGI, the Petition presents two substantial federal questions: (1) what is the proper or lawful rate for transmission service over the jurisdictional transmission facilities that are included in the ITS; and (2) what transmission service on the ITS is subject to FERC's jurisdiction.

Finally, RPGI maintains that CIPCO mischaracterized the determinations or conclusions that FERC made regarding the Complaint. RPGI asserts that relief under section 206 of the FPA, 16 U.S.C. § 824e, is available if the O&T Agreement or the FERC-jurisdictional rate charged by Midwest ISO fails to provide CIPCO with its full revenue requirements.

41

**4.** *Midwest ISO's Resistance*

In the Second Resistance, Midwest ISO provides five grounds to support its position that the court has subject matter jurisdiction over the issues raised in the Petition. Specifically, Midwest ISO asserts: (1) CIPCO's characterizations of its claims in the Petition are not controlling under the law of removal; (2) the relief requested by CIPCO requires the court to resolve a federal question; (3) the Petition necessarily involves the interpretation and enforcement of FERC OATTs; (4) other federal courts have addressed disputes over the interstate transmission of electricity and have concluded that federal subject matter existed; and (5) Midwest ISO's removal does not constitute a collateral attack on FERC's jurisdictional findings. Midwest ISO once again relies on the cases that it cited in the Notice of Removal.

With respect to its first ground, Midwest ISO cites *Peters,* 80 F.3d at 260, and *Franchise Tax*, 463 U.S. at 22-24, for the proposition that CIPCO may not defeat removal by omitting to plead necessary federal questions in a complaint. Aside from arguing that complete preemption principles apply in the instant action, Midwest ISO relies on *Grable*, 545 U.S. at 312-14, to support is contention that CIPCO's state-law claims necessarily raise a stated federal issue that is actually disputed and substantial. Midwest ISO also contends:

> [For] CIPCO to prevail on its [state-law] claims, a court will have to construe the [OATTs] of not only Midwest ISO but Alliant as well. For example, CIPCO's compensation for [third party] use of its transmission lines is outlined in the O&T Agreement, which is a federal tariff. [. . .] Likewise, Midwest ISO's agreements with Ameren and RPGI are rate schedules [that are] filed with FERC [and] that incorporate the Midwest ISO [OATT]. In order to prevail on its [state-law] claim, a determination must be made as to the legitimacy and effect of these federal tariffs and the reasonableness of their terms.
>
> CIPCO's claim for compensation, involving the interstate transmission of electricity, must be resolved in a federal

> forum. The interpretation and enforcement of federal tariffs
> by a state court is not consistent with the congressionally
> approved balance of regulation of electricity. States have
> jurisdiction over intrastate issues and the federal government
> controls interstate issues.

Regarding its second ground, Midwest ISO maintains that all of CIPCO's claims relate to the electricity that RPGI purchased and that is delivered in interstate commerce over the transmission systems of several utilities, including Alliant, pursuant to FERC-approved OATTs. Further, Midwest ISO maintains that, under section 317 of the FPA, 16 U.S.C. § 825p, the federal courts have exclusive jurisdiction over any claims involving violations of such OATTs.

Concerning its third ground, Midwest ISO asserts that: (a) CIPCO's right to payment for third party use of its transmission system is governed by an OATT, that is, CIPCO's claims are predicated on the rights and obligations set forth in Section 5.15 of the O&T Agreement; (b) CIPCO's claims, which stem from the transmission service that Midwest ISO provides to Ameren and RPGI by utilizing CIPCO's transmission system, implicate the Midwest ISO OATT; and (c) the relief sought in CIPCO's Petition can only be granted by FERC. Finally, with regard to its fourth ground, Midwest ISO contends that, when other federal courts confronted similar complaints, they have concluded that the defendants properly removed the actions, and, in its fifth ground, Midwest ISO states that FERC's jurisdictional determinations regarding the Complaint support removal to the federal courts.

### 5. *CIPCO's Reply*

In the Reply, CIPCO disagrees with the assertion made by RPGI and Midwest ISO that the quantum meruit or implied contract in fact claim, unjust enrichment or implied contract in law claim, trespass claim and conversion claim raise a disputed or substantial federal issue. Specifically, CIPCO argues (1) federal tariffs do not form the basis of CIPCO's state-law claims; (2) CIPCO does not seek payment pursuant to any federal tariff;

43

and (3) filing a complaint pursuant to section 206 of the FPA, 16 U.S.C. § 824e, does not resolve the state-law issues raised by CIPCO.

### B. Complete Preemption Does Not Apply

Complete preemption occurs when a federal statute has such "extraordinary" force that it "converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule." *Metro. Life Ins. Co.*, 481 U.S. at 65.

> Congressional intent is the "ultimate touchstone" guiding preemption analysis. *Pilot Life Ins. Co. v. Dedeaux*, [481 U.S. 41, 45] (1987) (citations omitted). "If the statute contains an express preemption clause, then the statutory construction should center on its plain meaning as the best evidence of Congress's preemptive intent." [*Peters*, 80 F.3d at 261].

*Lundeen*, 447 F.3d at 611-12; *see also CSX Transp. v. Easterwood*, 507 U.S. 658, 664 (1993) (explaining that preemption will not lie unless it is the clear and manifest purpose of Congress and evidence of pre-emptive purpose is sought in the text and structure of the statute at issue). Despite the assertions made by RPGI and Midwest ISO, no complete preemption language appears in the FPA. The closest express preemption provision, that is, section 317 of the FPA, 16 U.S.C. § 825p, provides federal courts with

> exclusive jurisdiction of violations of [the FPA] or the rules, regulations, and orders thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by, or to enjoin any violation of, [the FPA] or any rule, regulation, or order thereunder.

Neither in section 317 of the FPA, 16 U.S.C. § 825p, nor any other provision of the FPA does Congress manifest an intent to completely preempt state law in the field of electrical power regulation. *See T&E Pastorino Nursery, LLC*, 268 F. Supp. 2d at 1247-48; *In re Cal. Retail Natural Gas & Elec. Antitrust Litig.*, 170 F. Supp. 2d at 1057-58; *Indeck Me. Energy, LLC*, 167 F. Supp. 2d at 685-87; *see also Miss. Power & Light Co. v. Miss. ex rel. Moore*, 487 U.S. 354, 371 (1988) (implicitly recognizing the absence of complete preemption in FPA). Accordingly, removal based on complete preemption is unavailable.

### *C.  State Action Discloses Contested and Substantial Federal Issue*

CIPCO's Petition states only state-law claims, that is, quantum meruit or implied contract in fact, unjust enrichment or implied contract in law, trespass and conversion. Nonetheless, CIPCO repeatedly references the FPA, the Midwest ISO OATT and the O&T Agreement.   CIPCO predicates all of the state-law claims on violations of the O&T Agreement.  Specifically, CIPCO states:

> Usage of [Alliant's] and CIPCO's interconnected facilities is governed by an O&T Agreement which requires that[,] before third parties can utilize either CIPCO's or [Alliant's] electrical transmission facilities[,] permission must be obtained from the owner of those transmission facilities.

> Midwest ISO, [RPGI, and the Participants of RPGI who are] served by the use of CIPCO's electrical transmission system have not sought permission from CIPCO to use its [electrical transmission] system pursuant to the O&T Agreement.

Petition at 9.  Regarding the proper compensation for use of the ITS, all of CIPCO's state-law claims rely on the following statements:

> Midwest ISO continues to deliver power to [RPGI and the Participants of RPGI] over CIPCO's electrical transmission system without compensating CIPCO.

> Midwest ISO was informed on numerous occasions that the cost of using CIPCO's electrical transmission system is not included in [Alliant's] zonal rates under the [Midwest ISO] OATT.[26]

*Id*. at 10.  Further, as relief, CIPCO seeks payment based on the CIPCO OATT from either Midwest ISO or RPGI and the Participants of RPGI.  *Id*. at 11-17.  CIPCO contends that payment from RPGI and the Participants of RPGI is appropriate because they received

---

[26] Under the quantum meruit or implied contract in fact claim, CIPCO reiterates: "CIPCO informed [Midwest ISO and RPGI] that the zonal rates under the [Midwest ISO] OATT [do] not compensate CIPCO for the use of CIPCO's electrical transmission system."  Petition at 11.

energy and power carried over CIPCO's electrical transmission system. *Id*. Alternatively, CIPCO contends that payment from Midwest ISO is appropriate because Midwest ISO delivered power and energy over CIPCO's electrical transmission system, did not seek permission to use CIPCO's electrical transmission system and failed to compensate CIPCO. *Id*. In addition, CIPCO asks the court to order Midwest ISO, RPGI and the Participants of RPGI to pay CIPCO for any future use of CIPCO's electrical transmission system. *Id*.

Thus, the Petition makes clear that CIPCO believes a violation of the O&T Agreement occurred when Midwest ISO did not seek permission from CIPCO to use the ITS and paid only Alliant for third party use of the ITS. Based on such violation, the Petition seeks retrospective and prospective compensation that is based on a rate that is not part of the Midwest ISO OATT. The Petition does not hide the fact that the Midwest ISO OATT—which takes into account the Alliant OATT, the IPL OATT and the O&T Agreement—binds the parties to important obligations and duties that are relevant and necessary to the state-law claims.

It is clear from section 201(b) of the FPA, 16 U.S.C. § 824(b), that the jurisdiction of FERC includes the transmission of electric energy in interstate commerce. *New York v. FERC*, 535 U.S. 1, 19-20 (2002). Under section 205(c) of the FPA, 16 U.S.C. § 824d(c), IPL, Alliant and/or Midwest ISO must file schedules showing their rates and charges, and the practices and regulations affecting such charges. Iowa Electric complied with this section when it submitted the O&T Agreement as a rate schedule in the Iowa Electric OATT. Apart from the O&T Agreement, Iowa Electric submitted a basis of its charges. Both submissions by Iowa Electric enabled FERC to apply section 205(a) of the FPA, 16 U.S.C. § 824d(a), that is, the section of the FPA which requires FERC to determine whether the rules and regulations affecting or pertaining to the rates and charges made, demanded or received by a public utility are just and reasonable. Under the FPA, FERC ultimately accepted the O&T Agreement for filing. A tariff filed with a federal

agency, such as the OATT that includes the O&T Agreement, is the equivalent of a federal regulation. *See Cahnmann v. Sprint Corp.*, 133 F.3d 484, 488 (7th Cir. 1998) (citing *Lowden v. Simonds-Shields Lonsdale Grain Co.*, 306 U.S. 516, 520 (1939)). The term "regulation" in section 317 of the FPA, 16 U.S.C. § 825p, necessarily includes the OATTs filed by Iowa Electric, IPL, Alliant and Midwest ISO. Thus, federal courts have exclusive jurisdiction over any claim involving a violation of such OATTs.

All of the claims advanced by CIPCO are necessarily based on federal law. CIPCO's claims are founded on Midwest ISO's refusal to pay a rate that is anything but the rate that is set forth in the Midwest ISO OATT. The conduct that CIPCO seeks to condemn or the lawfulness of Midwest ISO's conduct is wholly governed by the Midwest ISO OATT. Because Midwest ISO's duties or obligations arise under the Midwest ISO OATT, any claim asserting that CIPCO is entitled to a rate that is not provided by the Midwest ISO OATT is necessarily based on an assumed violation of the Midwest ISO OATT. CIPCO's action turns entirely upon Midwest ISO's compliance with a federal regulation; absent a violation of the Midwest ISO OATT, no state-law liability could survive. The Petition necessarily presents a substantial and disputed issue that falls under the FPA, and, therefore, CIPCO's state-law claims are within the court's subject matter jurisdiction. *See Grable*, 545 U.S. at 314-15 (recognizing federal jurisdiction where state-law action disclosed a contested and substantial federal question); *Lockyer*, 375 F.3d at 840-41 (holding removal appropriate where viability of state action depended on whether the defendant complied with a federal regulation); *Indeck*, 167 F. Supp. 2d at 690 (concluding that complaint arose under federal law because the plaintiff sought to present a challenge to a federally-approved tariff in the guise of a state contractual claim).

Moreover, relief is predicated on a subject matter that is committed exclusively to federal jurisdiction. CIPCO essentially asks the court to conclude that CIPCO is entitled to a rate that is not included in, and is in addition to, the current rate that IPL developed for third party use of the ITS. CIPCO's right to relief requires the court to determine a

Case 1:06-cv-00053-LRR    Document 34    Filed 03/30/07    Page 47 of 49

hypothetical reasonable rate for the transmission service that Midwest ISO provided over the ITS, which includes CIPCO's facilities. If Midwest ISO, RPGI, and/or the Participants of RPGI are found liable under any of the state-law claims, damages can only be determined by calculating what the rate for transmission service would have been in the event that the rate under the CIPCO OATT had been included. Such a determination must be made by FERC. *See* 16 U.S.C. § 824e(a) (providing FERC with exclusive authority to set "any rate, charge, or classification" of any "transmission or sale" of electricity); *Middle S. Energy, Inc. v. Ark. Pub. Serv. Comm'n*, 772 F.2d 404, 411 (8th Cir. 1985) ("Congress gave FERC the power to make 'just and reasonable' any public utility 'rule, regulation, practice or *contract affecting* [a] rate, charge or classification [that] is unjust, unreasonable, unduly discriminatory or preferential.'"). Accordingly, because CIPCO challenges conduct within FERC's exclusive domain or CIPCO's right to relief depends on the resolution of a substantial and disputed federal issue, the court has subject matter jurisdiction. *See Grable*, 545 U.S. at 313-15 (concluding state-law action gave rise to federal question jurisdiction because it appeared from the complaint that the right to relief depended upon the construction or application of federal law).

## VI. CONCLUSION

In sum, CIPCO premises its state-law claims on Midwest ISO's failure to comply with provisions of the O&T Agreement and/or the Midwest ISO OATT, which are regulations under the FPA. The substantial, disputed issue of federal law in this case is whether a violation of the O&T Agreement occurred when Midwest ISO did not seek permission from CIPCO to use the ITS and when Midwest ISO, under the Midwest ISO OATT, paid only Alliant for third party use of the ITS. *See Grable*, 545 U.S. at 312-14 (examining when federal question jurisdiction will lie over state-law claims that implicate significant federal issues). The meaning of provisions within the O&T Agreement or rates within the Midwest ISO OATT are important issues of federal law that sensibly belong in federal court. *Id.* Because the state cause of action set forth by CIPCO turns on important

federal issues, the court retains removal jurisdiction.  Based on the foregoing, the Motion to Remand (docket no. 9) is **DENIED**.

        **IT IS SO ORDERED**.

        **DATED** this 30th day of March, 2007.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

49